FILED

2021 Sep-27  PM 02:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **VERN STINSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action Number |
| **v.** | ) | **2:19-cv-1396-AKK** |
| | ) | |
| **UNITED STATES STEEL** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Vern Stinson filed this lawsuit against United States Steel Corporation, his former employer, alleging race discrimination and retaliation in violation of 42 U.S.C. §§ 2000e *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII") and 42 U.S.C. § 1981.  Doc. 1.  U.S. Steel moves for summary judgment on all claims, contending that (1) the discrimination claims fail because Stinson cannot identify a similarly-situated comparator, (2) the retaliation claims fail because Stinson cannot show a causal connection between his protected activity and any adverse event, (3) Stinson cannot show its proffered reasons for its actions are pretextual, and (4) Stinson failed to show it subjected him to a hostile work environment.  Docs. 21; 22.  For the reasons discussed below, except for the race discrimination claims related to the discipline for failure to properly report an

absence and the discharge, and the race discrimination and retaliation claims related to the October 2017 discipline, the motion is due to be denied.

## I.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

On summary judgment motions, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Anderson*, 477 U.S. at 255. Any factual disputes will be resolved in the non-moving party's

favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.

### A.

Stinson, an African-American man, worked at U.S. Steel's pipe mill in Fairfield, Alabama from 2012 until his discharge in June 2018. Doc. 23-1 at 11, 13. Stinson began working as a utility technician and then worked as threader inspector in the mill's finishing area or department. *Id.* at 12-13. During the relevant time, Chris Cone, a Caucasian man, was Stinson's supervisor and an operation shift manager in the finishing area, doc. 23-3 at 11-12; Shea Moses, a Caucasian man, was the area manager, doc. 23-6 at 6, 10; Micah Aplin, a Caucasian man, was the

process manager in the finishing area, doc. 23-5 at 10; and Pat Thomas, a Caucasian man, was U.S. Steel's department manager for labor relations, doc. 23-4 at 11.

U.S. Steel did not maintain a written progressive discipline policy during the relevant period.  Instead, according to Thomas, U.S. Steel and the union agreed in practice to utilize a disciplinary process consisting of a written warning; one, three, and five-day suspensions; and discharge.  Doc. 23-4 at 15-17.  However, some infractions, including violations of cardinal safety rules, bypass the earlier steps and always result in a five-day suspension subject to discharge.  *Id.* at 16.   Under the practice in place, if a supervisor determines that an employee's conduct requires discipline, the supervisor notifies labor relations by completing an activity report describing the alleged infraction.  Docs. 23-3 at 16; 23-4 at 14-15, 24-25.  Thomas then decides what level of discipline is appropriate, prepares the written discipline form, and sends the form to the employee's supervisor, who gives it to the employee. Docs. 23-3 at 16-17; 23-4 at 15, 24-26.

Employees receiving a five-day suspension subject to discharge have a right to an informal 9(b) hearing during which U.S. Steel outlines its reasons and the employee and union can respond and explain why they do not believe the suspension is justified.  Doc. 23-4 at 13-14.  Thereafter, Thomas makes a final decision to either affirm the discipline or alter or remove the discipline.  *See* docs. 23-4 at 14, 32; 23-5 at 16-17.  If the employee is not satisfied with the final decision, he or she can file

a grievance with the union, which may then proceed to a second-step hearing and ultimately arbitration.  Doc. 23-4 at 14.

**B.**

In October 2017, Cone sent Stinson home early for allegedly sleeping and being out of his assigned work area.  Docs. 23-1 at 23, 26; 23-3 at 34, 38-40, 76.  In light of this alleged conduct, Cone sent an activity report to Thomas, which resulted in Stinson receiving two five-day suspensions subject to discharge.  Docs. 23-1 at 27; 23-2 at 39-40; 23-3 at 33, 76.  According to Stinson, when Cone gave him the discipline forms, Cone pushed him hard in the back as he was leaving Cone's office.  Doc. 23-1 at 33-34.  Stinson reported the incident, which Cone denied.  Docs. 23-1 at 35-36; 23-3; at 27-28, 42-43.  Approximately three weeks later, U.S. Steel held a 9(b) hearing on Stinson's discipline, and Thomas removed one of the suspensions.[1] Doc. 23-2 at 39-40.

**C.**

Stinson reported to work late on December 20, 2017.  Docs. 23-2 at 37; 23-3 at 79.  The next day Aplin sent activity reports to Thomas, reporting that Stinson had been tardy twenty times since June 29, and Aplin requested that Thomas discipline Stinson.  Docs. 23-3 at 78-79; 23-5 at 13; 23-4 at 30.  Two days later, Thomas issued

---

[1] The written discipline reflecting both suspensions remained in Stinson's personnel file.  *See* doc. 23-2 at 39-40.  And, although Stinson was suspended for five days, he actually worked and was paid for those days.  Doc. 23-1 at 28.

three five-day suspensions to Stinson for "excessive tardiness," failure to report that he would be tardy on December 20, and failing to work as scheduled that day.  Docs. 23-2 at 37-38; 27-2 at 7-9.

According to Stinson, U.S. Steel improperly considered him tardy at times when he reported timely to work.  In particular, he testified that although U.S. Steel considered an employee tardy only if he clocked in less than four minutes before his shift started, U.S. Steel counted him tardy on days he clocked in seven or eight minutes before his shift began.[2]  *See* doc. 23-1 at 39-40.  Stinson also contends that U.S. Steel did not discipline Steven Montgomery, a white employee, who was tardy on numerous occasions.  Docs. 23-1 at 40; 23-2 at 38.  Based on the alleged discriminatory treatment,  Stinson filed an EEOC charge on January 2, 2018, challenging the discipline he received, as well as the October 2017 discipline and pushing incident.  Docs. 23-1 at 5, 18; 23-2 at 37-38.  The EEOC sent a notice of the

---

[2] No written policy regarding exists.  *See* docs. 23-3 at 15-16; 23-4 at 16; 23-5 at 16.  The lack of a policy has resulted in varying descriptions of the informal policy in place.  Thomas testified that an employee is counted as tardy if she clocked in less than six minutes before the start of her shift, but that her supervisor should confirm she was not on the job either by visual confirmation or by a report from the employee the incoming employee would replace.  Doc. 23-4 at 34-36.  Aplin did not know about that rule, and he testified that U.S. Steel considered an employee tardy if he did not swipe in the gate by the start of his shift and that "there was no rule that said that if [an] employee was not at his machine [by his start time] that [he] was considered [] tardy."  Doc. 23-5 at 14-15.  Cone also testified that an employee was considered tardy if he clocked in past his scheduled start time, and that at one time U.S. Steel had a policy to consider an employee tardy if he clocked in less than six minutes before his shift started.  Doc. 23-3 at 13-15.

charge to U.S. Steel two days later, doc. 27-4 at 22, 26, which Thomas received, docs. 23-4 at 39-40; 27-4 at 23.

U.S. Steel held a 9(b) hearing for the tardiness discipline in early January. Doc. 23-4 at 32. During settlement discussions with Stinson's union representatives afterwards, Thomas offered to remove two of the three disciplines if Stinson dismissed his EEOC charge. Docs. 23-2 at 46; 23-4 at 36, 60-61. Stinson rejected the offer, and Raymond League, a union representative, told Stinson to "be careful because anything [he] did would be used against [him][.]" Doc. 23-2 at 46. Thomas later decided to remove Stinson's discipline for excessive tardiness, and issued revised discipline notices affirming the two suspensions for tardiness and failing to work as scheduled on December 20, 2017.[3] Doc. 23-4 at 32, 105-07.

## D.

Stinson missed work on March 11, 2018 because he was sick, "in a lot of pain," and had to receive intravenous hydration in an emergency room. Docs. 23-1 at 43; 27-2 at 12. U.S. Steel received notice about the absence from Stinson's wife two and a half hours after the start of Stinson's scheduled shift. Docs. 27-2 at 11; 23-4 at 46. Stinson returned to work on March 13 with a note from an emergency room physician releasing him to work on March 16. Docs. 23-1 at 42-43; 27-2 at

---

[3] Although Thomas affirmed the written discipline that reflected Stinson's suspension for five days subject to discharge, doc. 27-2 at 7-9, U.S. Steel allowed Stinson to work during those five days, doc. 23-1 at 38. Even so, the written discipline remained in Stinson's file. *See id.*

12.  In keeping with U.S. Steel's policy, he provided the signed release to his supervisor.  *See* doc. 23-1 at 42-43.  According to Stinson, he should not have received any discipline because of the medical release and his inability to call in from the hospital due to his condition.[4]  *See id.* at 43.

In the interim, before Stinson returned to work, Cone informed Aplin about the March 11 absence, and Aplin instructed Cone to complete an activity report to notify Thomas about the absence and failure to timely call in.  Docs. 23-3 at 45, 80; 27-2 at 11.  Based on that report, Thomas issued a five-day suspension subject to discharge for Stinson's failure to report off properly.  Doc. 23-4 at 45-46, 104.  U.S. Steel did not rescind the discipline when Stinson returned to work the next day and presented the medical release.  *See* doc. 23-4 at 104.

At the 9(b) hearing a few weeks later, Stinson explained that he woke up violently ill with vomiting and diarrhea on the day in question, was incoherent, and had to go to the hospital, and that he asked his wife to report off for him while he

---

[4] Under U.S. Steel policy, when an employee is unable to work due to illness, he should call to report off, or have someone call on his behalf, at least one hour before the start of his shift if he was scheduled to work a day shift, or at least two hours before the start of his shift for night shifts. Docs. 23-4 at 48; 23-6 at 23.  An employee may be subject to "suspension preliminary to discharge" for an absence without notice, "except in case of sickness or cause beyond the employee's control of a nature that prevents his/her giving notice." Doc. 27-4 at 19.  In other words, U.S. Steel may consider an employee's extenuating circumstances, such as illness, when deciding whether to discipline an employee.  *See* docs. 23-4 at 50; 23-6 at 23-24.  And, generally when an employee is absent without prior notice and returns to work with a medical excuse, a supervisor prepares an activity report regarding the incident, and labor relations decides whether to discipline the employee.  *See* docs. 23-3 at 46; 23-5 at 19; 23-6 at 24.

was in the hospital.  Docs. 23-4 at 46-49; 27-4 at 32-33.  Stinson also explained that

his wife had a problem calling in and had to ask him for help.  Docs. 23-4 at 49; 27-

4 at 32.  Following the hearing, despite having the medical excuse, Thomas affirmed

the discipline for improper call-off because Stinson did not remember when he woke

up, and Thomas viewed vomiting and diarrhea as common illnesses that generally

do not prevent employees from calling in to report their absences.  Docs. 23-4 at 46,

49-50, 64, 103; 27-3 at 4.    Finally, although Thomas affirmed the five-day

suspension, U.S. Steel allowed Stinson to work and paid him for those five days.

Doc. 23-1 at 44.

### E.

On May 31, 2018, Stinson worked as a thread inspector for the number six

threader in the pipe mill, which is a type of machine that threads the end of pipes.

Doc. 23-1 at 48-49.  The threader machines work in pairs, with two employees

working on an even-numbered machine and another employee working on an odd-

numbered machine,[5] so that pipes are threaded at both ends as they pass through the

machines.  Docs. 23-1 at 48; 23-8 at 9.  Also, the threaders do not operate

simultaneously.  For example, the number six threader first threads one end of a pipe,

---

[5] The even-number threaders have both a threader operator and a threader inspector working on
one end of the pipe, while the odd-numbered threaders have one operator who operates the machine
and also inspects the pipe.  *See* doc. 23-8 at 9.

then the pipe rolls down a table by gravity to the number five threader where the operator threads the opposite end of the pipe.  *See* doc. 23-1 at 48.

The thread inspectors inspect the thread on approximately every tenth pipe for quality control, and the inspectors at each end of a pipe coordinate with one another to control movement of the pipes through two sets of pin stops operated by human-machine interface ("HMI") touch screens.  Docs. 23-1 at 48; 23-8 at 9-10.  When the inspector for the number six threader finishes inspecting a pipe, he makes eye contact with the inspector/operator for the number five machine, who then pushes a button on a touch screen to lower the first set of pin stops to allow the pipe to roll down to inspection station where it is stopped by the second set of pin stops.  Docs. 23-1 at 48; 23-8 at 10.  Typically, the inspector/operator on the odd-numbered threaders is the person who releases the pin stops because that person works alone on the machine, while the inspector on the even-numbered threaders has an operator who works with him.  Docs. 23-1 at 48-49; 23-8 at 10.  But, the inspector on the even-numbered threaders also has the capability to lower the pins by pressing the machine's touch screen.  Docs. 23-7 at 12; 23-8 at 9; 23-10 at 20.

On the day at issue, Michael Thurman worked as the number six threader operator, Marcus Harris had the number five threader/inspector assignment, and Stinson worked as the number six inspector.  Docs. 23-1 at 47; 23-8 at 8-9.  Near the end of the shift, Stinson and Harris experienced problems with the HMI screens

10

locking up or freezing so they could not move the pins, and Harris had to restart the number five HMI screen after calling an electronics operator for advice.  Docs. 23-1 at 50; 23-5 at 48; 23-7 at 16, 40; 23-8 at 15-16.  Approximately twenty minutes later, a "near miss" incident occurred when a pipe rolled down and hit another pipe at the number five threader.  Docs. 23-5 at 48, 79; 23-8 at 10; 23-10 at 12.  Specifically, Harris lowered the first set of pin stops to allow a pipe to roll down to the second set of pin stops for inspection, and he then raised the first set of pin stops before inspecting the pipe.  Docs. 23-8 at 10; 23-7 at 40.  As Harris applied a sizing wheel to inspect the pipe, the first set of pins lowered again, and another pipe rolled down and struck the pipe Harris was inspecting.  Doc. 23-8 at 10-11.  Harris then stepped back, looked up, and saw Stinson turning around towards the pipe with his sizing wheel in his hands.  Docs. 23-8 at 11-12; 23-9 at 10.  Harris did not see Stinson press the HMI screen to lower the pin stops, but assumed Stinson did so.  Doc. 23-8 at 12.

According to Stinson, immediately before the near-miss incident, he had his back to the pipe while he calibrated his gauges on his inspection table.  Doc. 23-1 at 51.  He then picked up a forty- to fifty-pound sizing wheel to perform an inspection, and was turning back just as the two pipes collided.  *Id.*  Stinson denies pushing the HMI screen to lower the pin stops before the incident, and maintains that he was about four feet away from the screen.  *Id.* at 51-52.

11

Thurman, the number six operator, corroborates Stinson's account.  Thurman, who was cleaning his work area, did not see what caused the first set of pin stops to lower or see either Stinson or Harris press their HMI screens.  Doc. 23-7 at 13, 15. Thurman looked up when he heard the collision, and he saw Stinson holding the sizing wheel with both hands as he turned towards the pipes.  *Id.* at 14-15.  Thurman does not believe that Stinson could have pressed the HMI screen to lower the first set of pin stops and then pick up the sizing wheel before the pipes collided.  *Id.* at 23-24.

The plant manager, Dave Brown, and John Wilson, a manager of safety and industrial hygiene, witnessed the incident from a catwalk above the plant floor from where they were watching Harris work.  Docs. 23-9 at 10-11; 23-10 at 11-12.  Brown took pictures immediately before and after the incident that show the second pipe rolling towards the pipe Harris was inspecting and Harris stepping back after the incident and pressing the HMI screen.  Docs. 23-5 at 80-81; 23-10 at 12-13.  But, neither Brown nor Wilson saw what caused the near miss, or Stinson's actions immediately before the incident.  Docs. 23-9 at 10-12, 14; 23-10 at 14.

Wilson and Brown were alarmed by the incident because of the potential for injury to Harris, and they ordered work to stop so they could meet with Stinson, Harris, and Thurman.  *See* docs. 23-1 at 52; 23-8 at 12; 23-9 at 10; 23-10 at 12, 15. At the meeting, Wilson and Brown stated that they were "not out to get anybody"

and would not discipline anyone for the incident, but wanted to know what transpired from an accident prevention point of view.[6]  Docs. 23-1 at 53; 23-7 at 15; 23-8 at 12-13; 23-9 at 13; 23-10 at 16.  In response, Harris denied lowering the pin stops, and Wilson and Brown, who saw Harris working at the time of the incident, had no reason to doubt Harris.  *See* doc. 23-9 at 13.  Stinson stated that he did not press the HMI screen to lower the pin stops, had his back turned at the time, and did not see who let the pin stops down.  Docs. 23-1 at 53; 23-5 at 79; 23-9 at 13.  For his part, Thurman also stated that he did not see what happened, and he was not working in an area where he could have pressed the screen.  Docs. 23-4 at 54; 23-9 at 13.  And, in response to Wilson and Brown's request for written statements, Stinson wrote that he "had [his] back to the pipe," docs. 23-1 at 53; 23-7 at 39; Thurman stated that he "didn't see what happen[ed]," 23-7 at 41; and Harris wrote that he "assumed the inspecting operator on #6 machine[, i.e., Stinson,] let the pin stop down[,]" but that "the screen locked up earlier . . . [so he was] not sure if the screen failed," doc. 23-7 at 40.

   As part of their investigation, Wilson and Brown asked Aplin to determine if someone had pressed a button on the HMI screens by reviewing the "IBA" data

---

[6] Brown testified that he did not believe the safety incident itself was a terminable offense, but that not being truthful in a safety investigation would be a terminable offense.  Doc. 23-10 at 19.

recorded by the threader machines or HMI screens.[7]  *See* docs. 23-5 at 19-21; 23-9 at 13.  After examining the IBA data, Aplin concluded that Stinson pressed a button on the HMI screen for the number six threader to lower the pin stops immediately before the near-miss incident.  *See* doc. 23-5 at 22, 44.   However, Aplin admitted that he could not determine if a malfunction occurred on the HMI screen by examining the IBA data because that information was contained in "level 2" data that he could not access.  *Id.* at 24-26, 37-39, 45.  Aplin also acknowledged that the HMI screen for the number 5 threader malfunctioned shortly before the incident, and that the malfunction was not reflected in the IBA data.  *See id.* at 24-26.  But, Aplin ruled out a similar malfunction as the cause of the incident because he did not see any inconsistencies in the operating signals in the IBA data.  *Id.* at 47.

The day after the near miss, based on Aplin's investigation, U.S. Steel issued two five-day suspensions subject to discharge to Stinson for a safety violation and providing false information in an investigation.  Docs. 23-4 at 52; 23-5 at 23; 27-2 at 13-14.   At the 9(b) hearing, Aplin testified and offered evidence about his investigation of the IBA data, but he presented data for only a fifteen-second time span before the incident.  Docs. 23-4 at 53-54; 23-5 at 23-24.  Kevin Key, a union

---

[7] The IBA data tracks a binary code from a threader's HMI screen, and the data shows a high signal when the HMI button is pressed and a low signal when the button is released.  *See* doc. 23-5 at 20, 23-24.

representative with an electronics background, challenged Aplin's conclusions and testified that it was not possible to definitively say whether someone had pressed a button on the HMI screen based on the IBA data. *See* doc. 23-4 at 54-55. Ultimately, Thomas decided to credit Aplin's conclusions based on his assessment that Aplin presented data to support his conclusions whereas Key presented "theories or explanations[.]" *Id.* at 55. Following the hearing, Thomas converted Stinson's suspension to a discharge. Docs. 23-4 at 55; 27-2 at 13-14; 27-4 at 45.

Stinson filed a grievance. *See* docs. 23-2 at 48-49; 27-4 at 42. The day before the second-step hearing, a union representative informed Stinson that U.S. Steel had offered him a last-chance agreement allowing Stinson to return to work in exchange for dismissing his EEOC charge. Docs. 23-2 at 46; 23-4 at 58-59. Stinson rejected the offer, and at the second-step hearing, the union presented information regarding a subsequent incident a few days after the near miss in which the HMI screens and pin stops for the number 5 and number 6 threaders malfunctioned.[8] *See* doc. 23-5 at

---

[8] The employees operating the number 5 and number 6 threaders reported that the pin stops moved erratically, and they had to reboot the system. Doc. 23-5 at 26-27. Aplin investigated that incident to see if it may have bearing on the earlier near-miss incident, and by looking at the IPA data, he found that the button on the number 5 HMI screen was locked in the up or high position for several minutes, as if an operator was holding the button down to lower the pin stops, which caused the pin stops to stay in the lowered position. Docs. 23-5 at 26-28; 27-4 at 45. According to Aplin, the pin stops involved in this incident were the second set of stops, which were not the same set as those involved in the earlier incident, and he also testified that the IPA data from the two incidents were materially different. *See* doc. 23-5 at 27, 29-30, 45. Based on the data, Aplin concluded that the malfunction from this later incident could not have caused the earlier near-miss incident. *See* doc. 23-5 at 29-30. But, Aplin could not determine the cause of the later incident from the IPA data, and U.S. Steel replaced the number 5 HMI screen after that incident. Doc. 23-5 at 27-29.

26; 27-4 at 42, 45.  U.S. Steel challenged the relevance of the incident, and Aplin

testified that the two incidents "were patently different and unrelated."  Doc. 27-4 at

45.  Following the second-step hearing, Thomas affirmed Stinson's discharge.  Docs.

23-2 at 46; 27-4 at 48.  Stinson appealed, and a neutral arbitrator upheld the

discharge.  Doc. 23-2 at 48-61.  Stinson then filed a second EEOC charge, *id.* at 45-

47, and eventually this lawsuit.

## III.

Stinson asserts claims against U.S. Steel for race discrimination (Counts I and

II) and retaliation (Counts III and IV) in violation of Title VII and 42 U.S.C. § 1981.[9]

Doc. 1.  The court addresses the parties' contentions related to these claims in turn.

## A.

Stinson contends that U.S. Steel discriminated against him because of his race

when it disciplined him in December 2017 for allegedly reporting to work late,

failing to work as scheduled, and for excessive tardiness.[10]  Doc. 1 at 9-11; *see also*

doc. 26 at 24 n.18.  Because Stinson relies on circumstantial evidence of

discrimination, he may prove his claims using the burden-shifting framework

---

[9] "Title VII and § 1981 'have the same requirements of proof and use the same analytical
framework.'"  *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256-57 (11th Cir. 2012)
(quotation omitted).

[10] Stinson withdrew his race discrimination claims based on the March 2018 and May 2018
disciplinary actions, doc. 26 at 24 n.18, and those claims will be dismissed with prejudice.  Stinson
also contends that he never asserted discrimination claims based on the October 2017 disciplinary
action, *id.* at 7 n.3 and 24 n.18, and U.S. Steel's motion is moot as to those purported claims.

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  *See Kragor v. Takeda Pharm. America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (citation omitted). Under that familiar framework, Stinson bears the initial burden of establishing a prima facie case by showing he is a "qualified member of a protected class and was subjected to an adverse employment action in contrast to similarly situated employees outside [his] protected class." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (citation omitted).  If Stinson satisfies this burden, the burden shifts to U.S. Steel to produce a legitimate, non-discriminatory reason for the challenged action.  *Id*. (citation omitted).  If U.S. Steel produces such a reason, "the presumption of discrimination . . . drops from the case," *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citation omitted), and the burden shifts to Stinson to prove that U.S. Steel's proffered reason is pretext for its actual, discriminatory purposes, *Alvarez*, 610 F.3d at 1264 (citation omitted).

Still, "'establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.'"  *Lewis v. City of Union city, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).  And, "'the plaintiff will always survive summary judgment if he or she presents circumstantial evidence that

creates a triable issue concerning the employer's discriminatory intent.'" *Id.* (alteration in original omitted). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Lockheed-Martin Corp.*, 644 F.3d at 1328 (quotation omitted).

## 1.

U.S. Steel contends that Stinson cannot identify a similarly-situated employee outside his protected class that U.S. Steel treated more favorably and, therefore, cannot establish a prima facie case. Doc. 22 at 19-20. The relevant analysis requires Stinson to show that he and his alleged comparator "are 'similarly situated in all material respects.'" *Lewis*, 918 F.3d at 1224. Courts must apply this standard "on a case-by-case basis, in the context of the individual circumstances" of the case, considering, among other things, whether the plaintiff and comparators "engaged in the same basic conduct," "have been subject to the same employment policy, guideline, or rule," and share similar employment or disciplinary histories. *Id.* at 1227-28 (citations omitted). In addition, courts must be mindful that "a valid comparison will turn not on formal labels, but rather on substantive likenesses." *Id.* at 1228. This requires that "a plaintiff and [his] comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.*

Consistent with *Lewis*, the court now turns to whether the alleged comparator is similarly situated to Stinson.  According to U.S. Steel, Stinson's attendance record reflects twenty-six tardies between January 1 and December 21, 2017, docs. 27-4 at 28; 27-2 at 9; *see also* doc. 23-3 at 78, while Steven Montgomery had twelve, doc. 27-4 at 30-31, and therefore the two are not similarly situated.  But, Stinson testified that U.S. Steel considered him tardy when he was not actually tardy, doc. 23-1 at 40, and if the evidence is viewed in the light most favorable to him, he had a record comparable to Montgomery's.  In particular, Stinson believed that U.S. Steel had a policy that did not consider an employee tardy if he clocked in at least four minutes before the start of his shift.  Doc. 23-1 at 40.  For their part, Stinson's supervisor and manager testified that employees are considered tardy only if they clock in after their scheduled start time, *see* docs. 23-5 at 14-15; 23-3 at 14-15, which is actually more lenient than Stinson's version.  And, Stinson contends that, contrary to the policy he believed U.S. Steel had, U.S. Steel counted him tardy on occasions when he clocked in six to eight minutes before the start of his shift.  Doc. 23-1 at 40.  Indeed, the records before the court do not show that Stinson was in fact tardy.  For example, U.S. Steel contends that its gate swipe-in records show that Stinson "swiped into the gate after his shift had already begun" for each of his twenty-six tardies.  Doc. 22 at 7 n.4.  But, the exhibits U.S. Steel cites do not reflect the specific time when Stinson actually swiped into the gate, and instead only indicate the amount of time, in tenths

of an hour, that Stinson was tardy.  *See* doc. 23-4 at 42-43; 27-4 at 28-29; 23-5 at 15. And, Thomas testified that the tardies contained in the attendance records are based on a code entered by a manager.  Doc. 23-4 at 42.

The dispute regarding U.S. Steel's tardy policy coupled with Stinson's testimony and attendance record create a question of fact regarding whether U.S. Steel properly counted Stinson tardy on each of the twenty-six instances.  Thus, a question of fact exists on whether Stinson and Montgomery engaged in the same basic conduct.  Moreover, the attendance records show that Stinson was more than thirty minutes tardy on only two occasions in 2017, compared to Montgomery's eight.  *See* doc. 27-4 at 28-30.

U.S. Steel also contends that Stinson and Montgomery are not similarly situated because of a prior warning it issued to Stinson.[11]  Doc. 22 at 21.  Moses testified that he warned Stinson in October 2017 that his "tardiness was out of control" and that Stinson needed to work on his attendance issues.  Doc. 23-6 at 34, 36; *see also* doc. 23-4 at 31.  But, Stinson disputes receiving this warning, *see* doc. 23-1 at 30, and U.S. Steel offered no evidence that it documented this warning, *see* doc. 22.  Accordingly, a question of fact exists on this issue as well.

---

[11] U.S. Steel further contends that there is no evidence to suggest that Montgomery failed to properly report off.  Doc. 22 at 21.  However, this contention is cast into doubt by Montgomery's time record, which notes that the reason for his twelve tardies was "undetermined."  Doc. 27-4 at 30-31.

To close, U.S. Steel does not dispute that Montgomery and Stinson held similar positions, or that it subjected them to the same employment policies and rules. *See* doc. 22. In light of the factual disputes regarding whether they engaged in similar misconduct and whether U.S. Steel had warned Stinson previously, the court cannot find on this record that Stinson is not similarly situated to Montgomery. *See Lewis*, 918 F.3d at 1227-28. Therefore, U.S. Steel has not shown that Stinson cannot establish a prima facie case as a matter of law.

## 2.

U.S. Steel argues alternatively that Stinson cannot show that its proffered reasons for disciplining Stinson, i.e. violating company policy and workplace rules by repeatedly being tardy, are pretextual. *See* doc. 22 at 24-25. Because the articulated reason is sufficient for U.S. Steel to meet its light burden to produce a legitimate, nondiscriminatory reason, *see Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995) (citing *Perryman v. Johnson Prod. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983)), the burden shifts to Stinson to show pretext. Stinson can do so by: "(i) casting sufficient doubt on [U.S. Steel's] proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that [U.S. Steel's] proffered reasons were not what actually motivated its conduct, (ii) showing that [U.S. Steel's] articulated reason is false and that the false reason hid discrimination, or (iii) establishing that [U.S. Steel] has failed to clearly articulate

and follow its formal policies." *Lewis*, 934 F.3d at 1186.  And, when an employer's proffered reason is based on a violation of work rules, as in this case, an employee can also show pretext by "submit[ting] evidence (1) that she did not violate the cited work rule, or (2) that, if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999) (citation omitted).

Here, Stinson contends that U.S. Steel's proffered reasons are pretextual based on evidence that U.S. Steel had no set rules or standards related to discipline for tardiness and that U.S. Steel did not discipline Montgomery for tardiness.  Doc. 26 at 32-33.  Indeed, the record establishes that U.S. Steel did not have standard rules or policies and supervisors gave differing accounts on when an employee is considered tardy.  *See* docs. 23-3 at 13-16; 23-4 at 34-36; 23-5 at 14-16.  In addition, Stinson's testimony and his and Montgomery's attendance records create a material dispute regarding whether Stinson violated the tardy policy each of the times U.S. Steel counted him tardy, and whether U.S. Steel treated Montgomery more favorably.  *See* docs. 23-1 at 39-40; 27-4 at 28-30.  Based on this record, Stinson has met his burden to show pretext and survive summary judgment.

22

\*       \*       \*

In conclusion, Stinson has abandoned his discrimination claims based on the March 2018 discipline for failing to properly report off while he was in the emergency room and his discharge, *see* doc. 26 at 24 n.18, and U.S. Steel is entitled to summary judgment on those claims. However, because Stinson has shown questions of fact regarding whether Montgomery is a similarly-situated comparator and whether U.S. Steel's proffered reason for disciplining Stinson for tardiness is pretextual, Stinson's discrimination claims based on the disciplines for tardiness will proceed to trial.

## B.

Stinson contends also that U.S. Steel retaliated against him by discipling him in December 2017 and March 2018, discharging him in June 2018, and subjecting him to a hostile work environment.[12] Doc. 1 at 11-14; *see also* doc. 25 at 26, n.21. Stinson may prove his claims with either direct or circumstantial evidence of retaliatory intent. *See Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1270-71 (11th Cir. 2017). Stinson contends that he presented direct evidence that his December 2017 discipline and his June 2018 discharge were retaliatory, doc.

---

[12] Stinson clarifies that he did not assert any retaliation claims based on the October 2017 discipline, doc. 26 at 26 n.21, and U.S. Steel's motion is moot as to those purported claims.

26 at 27-28, a contention U.S. Steel disputes.  Therefore, the court begins with the direct evidence contention before moving on to the circumstantial case.

**1.**

Direct evidence is "'evidence, which if believed, proves the existence of a fact in issue without inference or presumption.'"  *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (quotation omitted).  "For that reason, 'only the most blatant remarks, whose intent could mean nothing other than to discriminate [or retaliate] on the basis of some impermissible factor constitute direct evidence of discrimination [or retaliation]."  *Jones*, 854 F.3d at 1270 (quotation omitted).  The Eleventh Circuit "has found direct evidence where 'actions or statements of an employer reflect a [] retaliatory attitude correlating to the [] retaliation complained of by the employee.'"  *Merritt*, 120 F.3d at 1189 (quotation omitted).  "Evidence that is subject to more than one interpretation does not constitute direct evidence."  *Marria v. C.R. England, Inc.*, 679 F. App'x 844, (11th Cir. 2017) (citing *Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996)).  If a plaintiff "presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the [employer] presents conflicting evidence.'"  *Merritt*, 120 F.3d at 1189 (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)).

As direct evidence of retaliatory intent Stinson asserts that: (1) in late January 2018, a union representative informed Stinson that Thomas offered to rescind two of the tardiness disciplinary actions if Stinson agreed to dismiss his EEOC charge, and when Stinson refused the offer, the representative told him "to be careful because anything [he] did would be used against [him] . . . ," doc. 23-2 at 46; and (2) six days after Stinson's discharge, a union representative informed Stinson that U.S. Steel "offered to let [Stinson] keep [his] job only if [he] signed a Last Chance Agreement in which . . . [Stinson] would have to dismiss and waive [his] pending EEOC charge and claims of discrimination," *id.*  But, U.S. Steel purportedly made those statements relating to Stinson's EEOC charge after issuing the initial decisions at issue.  *See* doc. 27-2 at 7-9, 13-14.  Thus, they do not provide direct evidence that the initial decisions to discipline or discharge Stinson were retaliatory.  Additionally, the statements were offers to settle all issues relating to Stinson's discipline and discharge, and, ordinarily, "settlement offers cannot be retaliation."  *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1259 n.8 (11th Cir. 2012).[13] Moreover, Stinson did not cite any evidence to suggest that U.S. Steel had any obligation to remove the disciplines issued or to rehire him.  *See* doc. 26.  Therefore,

---

[13] In *Chapter 7 Trustee v. Gate Gourmet, Inc.*, the Eleventh Circuit found that Gate Gourmet's offer to give the plaintiff a light-duty job in exchange for her dropping her EEOC charge could show retaliatory intent.  But, the Court noted that the plaintiff was entitled to a light-duty job under Gate Gourmet's policy, and that Gate Gourmet withheld that benefit from the plaintiff solely because of her EEOC charge.  683 F.3d at 1259 n.8.

the statements made during settlement discussions are not direct evidence of retaliation.

**2.**

To establish a prima facie case of retaliation using circumstantial evidence, Stinson must show "that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quotation omitted). Satisfying the causation element requires Stinson to prove that but for U.S. Steel's desire to retaliate, he would not have suffered the adverse employment actions. *See Booth v. Pasco Cnty.,* 757 F.3d 1198, 1207 (11th Cir. 2014) (citing *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 363 (2013)). He can prove this through "sufficient evidence that the decision-maker became aware of the protected conduct, and that there was a close temporal proximity between this awareness and the adverse action." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003) (citation and alteration in original omitted). If Stinson establishes a prima facie case, then the burden shifts to U.S. Steel to produce a legitimate reason for its action. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (citation omitted). Then, if U.S. Steel satisfies that light burden, Stinson must show that the proffered reason is pretext for retaliation. *Id.* He can do this by demonstrating "'such weaknesses,

26

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Id*. at 1136 (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)).  Finally, when "'the proffered reason is one that might motivate a reasonable employer, and employee must meet that reason head on and rebut it.'" *Id.* (quotation omitted).

a.

According to U.S. Steel, Stinson cannot show a causal connection between his protected activity and any of the three adverse actions and, therefore, cannot establish a prima facie case.  Doc. 22 at 27-29.  In particular, U.S. Steel argues that Stinson cannot establish causation based on his failure to produce any evidence that Cone and Aplin, who allegedly initiated the discipline and discharge, had knowledge of his EEOC charge.  Docs. 22 at 27-29; 29 at 6-8.  But, even though Cone and Aplin may have initiated the adverse actions by completing the initial activity reports, *see* docs. 23-3 at 16, 78-79; 23-4 at 14-15, 24-25, 30; 23-5 at 13, the undisputed record establishes that Thomas made the ultimate decisions at issue, *see* docs. 23-3 at 16-17; 23-4 at 15, 24-26, 50, 55; 27-2 at 7-9.  Thus, notice hinges on what Thomas knew.  *See Hurlbert*, 439 F.3d at 1298.  And relevant here, Thomas had the requisite notice for each of the challenged actions.

27

First, as to the three five-day suspensions subject to discharge related to Stinson's tardiness, while U.S. Steel is correct that it issued the initial notices approximately a week before Stinson filed his EEOC charge, docs. 27-2 at 7-9; 27-3 at 2-3, U.S. Steel overlooks that the decision on the disciplines were not yet final. Rather, the process called for a hearing, which occurred after U.S. Steel received the EEOC charge.  *See* docs. 23-4 at 13-14, 39-40; 27-4 at 22-25.  Moreover, Thomas allegedly injected the EEOC charge into the discipline process by offering to rescind two of the disciplines if Stinson dismissed his EEOC charge.  *See* docs. 23-2 at 46; 23-4 at 36, 60-61.  He subsequently removed one after Stinson refused to dismiss the EEOC charge, and he affirmed the other two.  Docs. 23-2 at 46; 23-4 at 105-07. On this record, an issue of fact exists regarding whether Thomas decided to uphold the December 22 disciplines in retaliation for the EEOC charge.

Second, Thomas issued the initial discipline to Stinson for improperly reporting his absence approximately two months after he learned of Stinson's EEOC charge.  *See* docs. 27-2 at 10.  "Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'"  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (quoting *Brungart*, 231 F.3d at 799).  "But mere temporal proximity, without more, must be 'very close.'"  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir.

2007) (quotation omitted).  While the Eleventh Circuit has found in an unpublished

opinion that a two-month gap between the protected activity and the adverse action

is insufficient by itself to show a causal connection, *Williams v. Waste Management,*

*Inc.*, 411 F. App'x 226, 230 (11th Cir. 2011), here Stinson has offered more than

just temporal proximity to show causation.  Again, Thomas injected the EEOC

charge in discussions about whether to uphold the December 2017 disciplines, and

affirmed two disciplines after Stinson refused to dismiss the charge.  *See* doc. 23-2

at 46.  That evidence provides some circumstantial evidence of retaliatory intent that

is sufficient to show causation between the EEOC charge and the discipline for the

absence.

Finally, Thomas also had knowledge of Stinson's EEOC charge when U.S.

Steel suspended Stinson subject to discharge for his alleged actions relating to the

near-miss incident,[14] and later decided to discharge Stinson following a 9(b) hearing.

Docs. 23-4 at 11, 39-40, 52, 55; 23-5 at 23; 27-2 at 13-14; 27-4 at 26, 45.  Thomas

also injected the charge into the process by again purportedly asking Stinson to

dismiss the charge in exchange for reinstatement.  Docs. 23-2 at 46; 23-4 at 58-59.

To close, based on this record, which includes Thomas mentioning or

considering the EEOC charge in his determination on how to resolve Stinson's

---

[14] Although Andrew Stanley, an employee in labor relations, issued the written discipline notice
to Stinson, Thomas testified that he discussed the discipline with Stanley.  *See* doc. 23-4 at 52.

various challenges to the disciplines in question, Stinson has shown the necessary causal link to satisfy a prima facie case.

b.

U.S. Steel argues in the alternative that Stinson cannot show its proffered reasons for its actions are pretextual.  *See* doc. 22 at 25-29.  For the reasons discussed below, the court finds questions of fact exist on this issue.

(1)

U.S. Steel contends that it disciplined Stinson for tardiness and failing to properly report off in violation of its policies and workplace rules, doc. 22 at 25, which are indeed legitimate, non-retaliatory reasons to discipline an employee.  But, "an employer's deviation from its own standard procedures may serve as evidence of pretext."  *Hurlbert*, 439 F.3d at 1299 (citations omitted).  And, as discussed above, a question of fact exists regarding whether Stinson violated U.S. Steel's tardy policy on each of the charged occasions.  *See* Section III(A)(2), *supra*.  Stinson also presented evidence suggesting he did not violate policies relating to absences on the day he went to the emergency room.  The policy provides that an employee may not be subject to discipline for failing to properly report off if an illness is of a nature that prevents him from giving notice.  *See* doc. 27-4 at 19.  Stinson's illness qualifies when the evidence is viewed in the light most favorable to him.  In addition, Thomas did not take any steps to verify whether a problem may have prevented Stinson's

30

wife from reporting his absence earlier, as Stinson claimed, even though Thomas had purportedly done so in the past with similar reports from other employees. *See* doc. 23-4 at 49. Moreover, the close temporal proximity between Stinson's EEOC charge and Thomas's decisions to affirm the disciplines for tardiness and issue discipline for improperly reporting off is at least some evidence of pretext. *See Hurlbert*, 439 F.3d at 1298. All of this evidence, coupled with Thomas's attempt to have Stinson dismiss his EEOC charge, is sufficient to create a question of fact regarding whether U.S. Steel's reasons for disciplining Stinson for tardiness and failing to properly report off are pretext for retaliation.

(2)

Next, U.S. Steel asserts that it discharged Stinson for a safety violation and false statement relating to the near-miss incident. Doc. 22 at 25-26. And, U.S. Steel contends that Stinson cannot show its reasons are pretextual, especially because a neutral arbitrator upheld the discharge. *Id.* To support that contention, U.S. Steel correctly notes that when an "'employer's [] investigation . . . produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions—that is, to accept one as true and to reject one as fictitious—at least, as long as the choice is an honest choice.'" *Gogel*, 967 F.3d at 1148 (quoting *E.E.O.C. v. Total Sys. Servs.*, 221 F.3d 1171, 1176 (11th Cir. 2000)). But here, the record contains evidence that, when viewed in the light most favorable

to Stinson, raises a question of fact regarding whether Thomas's decision to credit Aplin's version of events over Stinson's was an "honest choice."

There are multiple reasons that undermine Aplin's and U.S. Steel's investigation. To begin, the record shows that Aplin only examined the IBA data to investigate the near-miss incident even though a malfunction occurred with the number 5 HMI screen approximately twenty minutes before the incident, which would not be reflected in the data, and Aplin presented IBA data for only the fifteen seconds prior to the incident at the 9(b) hearing. Doc. 23-5 at 24-26, 37-39, 45. Next, Aplin admitted that he saw no indication in the IBA data that Harris pushed a button on the number 5 HMI screen immediately after the incident even though Harris testified that he did so and Brown photographed Harris pressing the screen. *See* docs. 23-5 at 45-46; 23-10 at 13, 15. In addition, U.S. Steel did not acknowledge Thurman's testimony that Stinson was holding his sizing gauge at the time of the incident and would not have had time to press the HMI screen to lower the pins and then pick up the gauge before the pipes collided. *See* doc. 23-7 at 23-24; *see also* docs. 22; 29. All of these reasons, and the injection of the EEOC charge into the decision on whether to uphold the discharge, raise an issue of fact on the purported "honest choice." Therefore, viewing all of this evidence in the light most favorable to Stinson, the court finds that questions of fact exist regarding whether U.S. Steel's proffered reasons for discharging Stinson are pretext for its actual, retaliatory intent.

\*     \*     \*

To summarize, questions of material fact exist regarding whether Stinson can show a causal connection between his EEOC charge and the adverse events at issue, and whether U.S. Steel's proffered reasons for its action are pretextual.  Thus, U.S. Steel is not entitled to summary judgment on Stinson's retaliation claims based on his discharge and disciplines for tardiness and failing to properly report off.

**3.**

Stinson asserts that U.S. Steel also retaliated against him by subjecting him to a hostile work environment.  Doc. 1 at 12-13.  As the Eleventh Circuit recently explained, the standard for a retaliatory hostile work environment claim is less stringent than the one used for typical hostile work environment claims based on a protected characteristic.[15]  *Babb v. Sec'y, Dept. of Veterans Affairs*, 992 F.3d 1193, 1205-07 (11th Cir. 2021); *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861-62 (11th Cir. 2020) (per curium).  And, to establish such a claim, Stinson must only show that the harassment he suffered "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Monaghan*, 955 F.3d at 861 (quoting *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008)).

---

[15] To establish a hostile work environment claim arising from harassment based on a protected characteristic, a plaintiff must show that the harassment was "'sufficiently severe or pervasive to alter the terms and conditions of the [plaintiff's] employment and create an abusive working environment.'"  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

Here, Stinson presented evidence that after he filed his EEOC charge, U.S. Steel: (1) affirmed two five-day suspensions for tardiness, (2) issued a five-day suspension subject to discharge for failing to call off properly, and affirmed the discipline even though Stinson testified that his illness prevented him from calling in and his wife encountered trouble when she tried to call in for him, and (3) discharged Stinson following the near-miss incident.  While U.S. Steel may be correct that these incidents do not rise to the level of severe or pervasive harassment, *see* doc. 22 at 30-31, the issue here is whether the alleged harassment might have dissuaded a reasonable employee from making a charge of discrimination.  *See Babb*, 992 F.3d at 1196.  U.S. Steel does not address this issue, *see* doc. 22, and consequently its motion on this claim fails also.

## IV.

U.S. Steel's motion is due to granted on the discrimination claims based on Stinson's March 2018 discipline for failing to properly report off and June 2018 discharge, and the motion is moot as to Stinson's purported discrimination and retaliation claims based on the October 2017 discipline.  However, questions of material fact preclude summary judgment on the discrimination claims based on Stinson's discipline for tardiness, and the retaliation claims based on Stinson's disciplines for tardiness and failing to properly report off and his June 2018

discharge.  And, U.S. Steel did not meet its burden on the retaliatory hostile work environment claim.  Those claims will proceed to trial.

      **DONE** the 27th day of September, 2021.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE